All right, the next case we'll hear is United States v. Aaron Sr., Juarez-Gomez. Mr. Gilbert? Good morning, Your Honor. Aaron Sr. works, doesn't it? To distinguish from Aaron Jr.? Well, I'd rather have more distinction than that, Your Honor, but I'll address him any way the Court would like. No, that's all right. You handle it the way you wish. May it please the Court, I'm Joseph Gilbert, and I do represent Appellant Aaron Juarez-Gomez before this Court. They are father and son, though, aren't they? Actually, Your Honor – Or is that not so? That came out in sentencing. In sentencing, it was a statement provided from the minor. Two law enforcement officers came before the Court that said that my client was his father. And – You're not seriously confessing, are you? No, Your Honor, but I think it's important for the conspiracy allegation. And the first issue I wanted to bring up for the Court, of course, is that the Court should reverse the conspiracy conviction because substantial evidence admitted during the trial would not provide a reasonable fact-finder proof beyond a reasonable doubt that Aaron Juarez-Gomez, in fact, joined into the conspiracy that existed between Pedro and Erasto, his named co-defendants in the case. Did Aaron own that pickup truck that they kept observing? No, sir. No, sir. In fact – Who drove the pickup truck? Aaron drove the pickup truck to the four occasions – the four buys, if you will. I refer to them as four, even though the last one didn't really go through because it was when the bust occurred. Wasn't the pickup truck observed also at the trailer? It was followed back to the trailer by agents after the second day of the transactions that occurred at the food line on the 22nd of September. They followed it back, observed it go up to the trailer, and Agent – I believe it was Agent Marshburn – indicated that he did not – he stayed around for about an hour to see if Mr. Aaron Juarez-Gomez came out, and he did not see him. Although, from his position in the woods, it was really unclear if he ever even saw him. He never testified he saw him go into the trailer, either. Is it disputed that he lived there? At trial, yes, Your Honor. At trial, it's really important to distinguish between the evidence that came before the judge's sentencing and at trial. At trial, the only evidence we have that connected Aaron Juarez-Gomez to that trailer was the fact that the agents saw the yellow truck that he operated during the sales go back to that trailer, and the agent stayed for one hour. Who leased the trailer? Who leased it? At sentencing, there's no evidence who leased the trailer, Your Honor. I'm sorry, at sentencing it came in. At trial, there's no evidence who leased it. At sentencing, what happened was that Agent Summerlin testified that he interviewed the landlord. There was, in fact, two different residences that were under investigation by the Johnston County Police and by the Wilson County Police also, although that's not really in. So the lease information you're saying came in at sentencing but not at trial. That's correct, Your Honor. How about the rent information, the son paying the rent? In fact, the only evidence at trial of that was in Aaron Miguel-Gomez's wallet found in the house. That's the son? Yes, sir, who we now know is that. But at trial, a person who opened the door and identified himself as Aaron Gomez had in his wallet the rent receipt, which is Government Exhibit 68, and it was admitted, I believe, around page 278, but it's not part of the record, unfortunately. That exhibit's not before the court. That rent receipt, as I recall, basically simply said rent made out to Aaron Gomez. It didn't have middle names or anything like that on it, and it was the rent receipt. So you have a rent receipt made out to Aaron Gomez in the wallet found of a person who's not my client at the scene. You have agents who follow the truck back to the house after the second transaction and after the third transaction. There were four transactions. Was there any suggestion during trial that Aaron Jr. was the son of your client? The government attempted it, but the court did not allow that. That evidence, if that was considered, would clearly be harmful error. Why is that? Because the court specifically held that it wasn't for the truth of the matter asserted and did not allow the government to pursue that line of questioning any further. What happened was the agent said, and I objected, the agent said— Aaron's trailer, right? He was the lessee on the trailer? Well, there's no lease agreement, Your Honor. What happened at sentencing is that Agent Summerlin told the court that he interviewed the landlord who owned that particular trailer, and the landlord said that he rented it out to a group of Hispanic individuals, the same ones who had previously lived in the trailer that was owned by his son, I believe, and where the same family members owned both. And when he was shown a photo ID of my client, he failed to be able to pick him out from a photo ID. So there's no evidence that he lived there at the trial? There's zero evidence that he lived there, Your Honor, Judge Gregory. No evidence at all that he lived in the trailer. But he went there. There's evidence that he went there. There is. And it was a stash house. Yes, Your Honor. Yes, Judge Niemeyer, there is evidence that— And he engaged in drug deals multiple times with that truck, and the truck was traced to the trailer. Was he seen going in the trailer? There's no evidence that he actually was seen going into the trailer. The agent who testified about the first day said, I waited to see if he came out, but there's no evidence on the record that he actually saw him going out. Well, why isn't that enough? Well, Your Honor, I just—again, I think that it's not enough to be substantial. To be substantial evidence, it has to be enough that a reasonable jury concluding that this person who engaged in four drug sales was seen after the second sale to drive to a garage and mechanic shop where he stayed between 45 minutes and an hour, and then seen to drive to another unrelated house for an indeterminate amount of time, and then seen to drive to this house, which ultimately ended up containing the stash. And then, admittedly, the second day, he drives again to another house, and he drives back to this house. By this house, you mean the trailer? The trailer, yes, sir. The subject of what we call— How many times did they trace him coming back to the trailer? They followed him twice to the trailer. Twice to the trailer. Yes, sir. But never saw him get out or go in or talk to anybody? No testimony to that effect, Your Honor. That would have to be just speculation as to what he knew was in the trailer. Exactly. Now, clearly, if they had something linking him to the trailer, something further within the trailer, if he made statements saying that, you know, that that's where he was going at the trial level, then that would be something. Right. And I think that it's important because the government basically, in their brief, sort of lumps it all together. They lump together the sentencing and the trial information in order to support the conspiracy. Why doesn't that place him in the trailer? They trace him—they follow him twice going to the trailer, and the trailer turns out to be a stash house, and they know he's engaged in drug transactions. Even if, Your Honor, he's—even if he goes to that trailer, just like he went to the mechanic's shop and stays—  For an hour. The mechanic's shop, whatever he's—the obvious big inference is that he's delivering drugs to these various locations, but he ends up as his anchor point back at the trailer. And they just keep watching, and they didn't see him come out. For an hour. Twice. Twice. Now, I have to add one point so that it doesn't look like I'm trying to twist the record. And it turns out that the trailer is a stash house. Clearly. Clearly, there's lots of drugs in the trailer, none of which are connected to the sales that he made. There's no evidence at all linking the drugs he sold to the ones in the trailer. They took—they gave him serialized money three days in a row that he ostensibly took back with him wherever he was going. None of that money is found in the trailer. There's literally nothing at the trial stage that links him other than mere presence at the trailer. And the judge did give a mere presence instruction. A reasonable jury hearing the mere presence instruction and saying, all right, what do we have? We have a guy who's overwhelming evidence of four sales, to which he was clearly convicted of the distribution, who then drives to numerous locations, one of which is the trailer. Didn't you say the rent receipt was in the son's pocket at the trailer? In the wallet. Yes, sir. Yes, Judge Agee. It was in his wallet. One rent receipt. I know, but it doesn't matter. That's a rent receipt. That means— It's some evidence. Yeah. It is clearly some evidence, Judge Niemeyer. But now I want to add one more fact. Evidence of what, though? That's the question. Was your client's name on it? Somebody—it was made out to Aaron Gomez. Aaron. Now, whether it was Aaron Miguel Gomez, whether it was Aaron Flores Gomez— And the person who had his name is Aaron, too, right? That person who answered the door identified himself as Aaron Gomez. Right. So—but there's one more fact I want to point out because I'm sure government will point out if I don't get to it, and that is that on the third day, an agent followed the truck to the scene. And while he was standing there trying to see it, the landlord came out of a nearby house and walked up to him. And the agent told the landlord, I want you to call me if you see the truck leave. And the agent testified that the landlord called him about an hour and a half before the fourth day where they made the bust. So we have evidence that the landlord called him. We don't know, again, why the landlord called him. We don't know if the landlord maintained 24-hour surveillance. He came out to the truck and left. Isn't that the only inference you can draw? That's—well, that's an inference, but I think you have to draw an assumption because, again, the judge, over my objections, very carefully limited the testimony. The testimony was limited to the agent told him to call me, and he did call me back. But I just wanted to point that out so the court doesn't think that I'm overlooking another fact. But if you take all those facts at trial, if a reasonable jury took all those facts at trial, knowing only what you now know that links him to that trial, and with the mere presence instructions the judge gave, it doesn't support the conspiracy conviction. It's not enough to support it. There's just scant connection between him and what I'd call the Johnston County house. No property of his belonging to him was in the house. No money from the sales was there. He did drive the yellow truck, which he didn't own. There's tons of evidence linking Pedro Erasto to the house. Who owned the truck? That didn't come out at trial, Your Honor, but somebody that was uncharged and not my client. So for this record, we don't know who owned it. We don't. Right. We don't, Your Honor. We know he drove it regularly. He drove it certainly to those four sales. And he was convicted. I mean, obviously there's evidence that he was involved in those. Overwhelming evidence that he distributed the drugs. Overwhelming evidence of that. If I could, I'd like to move on to the two-point enhancement for leadership. There's no evidence in this case of my client having any decision-making authority whatsoever, and this Court in Chambers pointed out a number of things, which, in fact, the trial judge recited at sentencing. The nature of participation among those committing the offense. My client was clearly among the lowest rungs of the ladder. He was the delivery man for the drugs. There's zero evidence of him recruiting any accomplices at the trial or the sentencing phase. There's zero evidence that he claimed a right to a greater share of the fruits of the crime. There's zero evidence of him planning or organizing anything, although the judge on page 494 said he helped to lead the drug house, which is the hub of the activity, stating a conclusion but not drawing it upon any facts to get to that. There is little proof of him having any control or authority over others, and the only reason I say little proof is because at sentencing, again, and said that my client basically got the oral lease on the house and his son made at least one payment. So arguably there's slight evidence that he exercised control, but my argument is that merely the fact that his son actually paid the rent once does not show us at all if he did that at my client's direction or not. So clearly there's insufficient evidence for the leadership enhancement. And now for the use of the minor, if I may turn to that issue. The plain language of the sentencing guidelines requires individualized consideration. In fact, it says the defendant. It doesn't say reasonably foreseeable or that during the course of the conduct it occurred. It says the defendant used him. There is no record at all in this case of any affirmative action or any statement by Aaron. There's not evidence that he directed him to do it. There's evidence that the son, in fact, did make one payment. The others may have made payments as well. We don't know. But what I'm saying, Your Honor, is there's a gap. There's nothing that indicates my client had his son or told his son to make that payment. That's right, Judge Agee. I would maintain respectfully that that's not enough to show that my client directed him to do that under the facts of this record. There's no record of any statement by my client directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting the minor to commit any illegal act at all in this case or to participate in the conspiracy with Pedro or Rasto or any others. And this, Your Honor, is not a status enhancement such as a special skill enhancement or anything like that. However, it appears that the trial judge did kind of create it into a status enhancement  and not because of any actions that my client took. I guess I'd like to reserve the rest of my time for rebuttal. Thank you. Mr. Rogers? Good morning. May it please the Court. This is Joshua Rogers again for the United States. With respect to defendant's argument that the evidence was insufficient to convict the defendant, I think it's important that we bring up a fact that I noticed while rereading the record, and that is at JA 284 through 85, the AUSA brings up several exhibits, which are actually photographs of the defendant's room. And she asked, Do you recognize the exhibits I just showed you? She asked Agent Allen. He says, Yes, ma'am. She says, What are those exhibits of? He says, Pictures of Aaron Gomez's room. There was no objection at that point. And, in fact, if there was any question as to whether she was speaking about Aaron Gomez, the father, a couple of pages later in the transcript, the agent once again makes reference to the fact that these photographs are of Aaron Gomez's closet. And the defense counsel says, Objection. Characterization. The court says, Overruled. You're talking about Junior when you talk about that? Is that what you're talking about? The witness says, No, sir. What page is that on? That is actually at 284 of the JA. So, essentially, at one critical point in the trial, it came out that, in fact, that was defendant's room that had the cocaine, liquid cocaine. It had the drug paraphernalia, cash. And so there is a direct link in the trial transcript between the defendant and his bedroom in that trailer. And if there's a direct link between him and the stash house, that makes for a pretty compelling case that when he was going back and forth to his home where the drugs were stashed, in between counts two and five, the deals from counts two and five, that, in fact, there was sufficient evidence. With respect to the use of a minor enhancement, again, although opposing counsel continually says there's no evidence that this father has directed his son, that is a very narrow reading of the commentary to 3B1.4, which also includes encouraging and feaster, which includes otherwise engaging. We absolutely have a father doing this, and we know that because, most importantly, he brought him to live in the nerve center of this stash house where there was a serious manufacturing and distribution operation. You're going to go back to parenting again, right? No, I'm not talking about parenting. You said he brought him into the house. He lives there. We're arguing that bringing— Aren't you saying he lived there? You said he brought him in. You say he lives there? Yes, Your Honor. Okay. We're not arguing that bad parenting equals use of a minor for the purposes of 3B1.4. What we're arguing— As a parent, he did that. What we're arguing is that bringing a child into a stash house, having him pay rent, and letting him hang out and be apprenticed by drug dealers constitutes encouragement and otherwise engaging, and it just so happens to be bad parenting as well. You make an argument, but your argument doesn't fit with the evidence. Where's the evidence that he directed him to pay the rent? The evidence, based on a preponderance of the evidence standard, is that he was the one who was responsible for the lease. As it turns out, his son is also occasionally paying for the rent. That came out in the trial? We're talking about sentencing. We're talking about a conspiracy. I thought you started off by the conspiracy. Well, I concluded my argument with respect to sufficiency of the evidence, and then I said with respect to the— You think it's sufficient just because the police officer looked at a picture and said, that's his room? We would argue that— That's the only thing you cited, I recall. Well, there is plenty of other evidence. I was just bringing up that particular point. Back to the sufficiency of the evidence. First of all, the important thing is the standard, which is every reasonable inference goes to the United States. There was plenty more evidence in addition to this. Based on facts. Based on facts. And the facts that we have in the record are that defendant lived in this bedroom. At trial, when did that come out? That came out at JA 284 through 85 when the officer was asked, whose bedroom is this? Who are all these? These pictures come from what bedroom? And it was the defendant's bedroom. He just said it, but when was he there? Was he there a year ago? Was he there five years ago? You have to have some proximity, even if you're going to use that blatant hearsay, no foundation for it, allowing that. You're saying that's your evidence? The defendant was there the day of, actually. He left that house on the way to his fourth deal. Okay, where's the evidence that somebody saw him in the house at trial? There is not actually evidence that someone saw him in the house. Where's the evidence they saw him go in? There's actually evidence on page 190 of the record, in which the detective, Marbury, argues, I went back. Argues? Detective argues, you said? I'm sorry. You're probably right, though, based on this record. It looked like that's what it was. Go ahead. I'm sorry. The detective didn't argue. He testified. I went back up to the top of the road to see if defendant came back out. Now, he did not say he came in, but the reasonable inference from this is if he is waiting to see if he comes back out, that he saw him come back in. You can't do that. There's no evidence that he went in. My goodness, that is rank intellectual disturbing. In other words, he said, I didn't see him come out. Well, you can infer, I saw him come in, but no evidence that he did. We're dealing with. We're talking beyond a reasonable doubt here, aren't we? We're actually talking about evidence viewed in the light most favorable to the United States. But the initial inquiry and the standard is beyond a reasonable doubt, is it not? Well, and as the defendant points out. I mean, can you answer that question? Is that right? Yes, Your Honor. All right. And if all those inferences you said that we must attribute to you, give you the best light, have to be based on facts, facts, and then reasonable inferences from facts. But the facts are, there's no evidence you ever saw him in, go in, or come out of the trailer. We don't have to prove that he was in the trailer to prove that he had at least a tacit agreement with these co-conspirators who did live there and who he was going back and forth this place in between the drug deals that constitute counts two through five. Twice you said the truck was there. You seem to me if you're observing someone, you would see them go in. We do have evidence that the officer says he did not come back out. So, in other words, the officer saw him come in. But, again, whether he – The officer saw him come in but at trial wouldn't say that? Does that make any sense? I'm sorry. Does that make any sense that the officer saw him go in but would not say that at trial? Does that make any sense to you? To you. To you. Yes, Your Honor. I mean, you're a person of common sense and reason, you're a learned counsel. Does that make any sense to you? It makes sense to me. It does. When someone's testifying that they don't – Okay. All right. Good. Never mind. Go ahead. Finish your argument then if that makes sense to you. Okay. So in light of – Was there any – when the officer testified that the bedroom and the trailer belonged to the Aaron Sr., was that evidence contested? At the sentencing hearing? No, at trial. In this, the 284-285, you said that was trial evidence, right? It was not objected to at that point. All right. So what we have here is a defendant who is going to multiple controlled purchases and he's going back and forth to a stash house that is chock full of cocaine, liquid cocaine, crack cocaine, where there are multiple firearms, and where we have a defendant who is repeatedly offering to his boss. So he's indicating, I've got an agreement with somebody out there and I want you to meet this person. It's the United States argument if that's not sufficient evidence to satisfy the standard on appeal, then nothing else is. And we would also, going back to the use of a minor, we do have a father who is most certainly encouraging his son – I'm sorry, but the evidence that he offered to introduce someone to his conspiracy or to sentencing? It goes to the conspiracy as well. All right. I have just one follow-up. With respect to the use of a minor, again, the opposing counsel repeatedly brings up just one phrase from the sentencing guidelines and that is directing. The word encouraging is there too. When a father who brings his son in and happens to have behavior that's not only bad parenting but is also encouraging a minor to participate in the crime, the charged offense here, brings him into a stash house where there are 10 kilos of cocaine total, where there are guns lying around everywhere, and where he's being apprenticed by a couple of brothers to participate in drug dealing, most certainly that father has brought his son into a criminal situation where he'll be encouraged to participate. And to use Judge Gregory's example, bringing his son into this situation and absurd as him bringing a teenage daughter into a brothel and saying, I let her hang out with pimps, but it was up to her. She ended up being a prostitute is a shock to me. No, a parent who brings a child into this sort of situation is, in fact, creating a situation where the child is going to be encouraged to participate in a conspiracy. And alternatively, without going through all the arguments we just previously made, we would also argue that as this court has already found, Pedro Gomez Jimenez was, in fact, responsible for affirmatively using this minor to cook crack cocaine, and this defendant is also responsible under the theory of co-conspirator liability for doing so. With respect to the leadership enhancement, all that's needed, and the court did cite this law, is authority over at least one other person in the conspiracy, or there needs to be proof that the defendant actively exercised authority over the operation or actively managed its activities. There is plenty of evidence here to support a reasonable inference that the defendant did have some leadership role over at least one person. That would be his son. And what was that evidence? He led his son into this stash house to live there. The son had nowhere else to live, but he brings his son in there into a stash house where it's not like he's paying rent along with these others. He is the one who's responsible for the lease, and then he's having his son pay rent occasionally for him. Well, under that theory, then, you wouldn't need any of the drive-alongs and being present. The fact that he lets his son live there would be enough. Under your theory, you just say that. It's not letting his son. He's leading his son. When you have a situation where you have a father, minor, son, co-conspirator, that is going to be strong evidence of leadership. That's a tautology now. You're making a conclusion already. Come on, let's get with the evidence. You're saying that the evidence is that he led him to the stash house. He lives there, right? Exactly. That's what you call, that's the engagement because he lives there with his father? We don't even know his father in this evidence. But anyway. We actually do know that for the purposes of sentencing that this was his father. So he lives there. That's enough. Correct. To bring your son in there and then in addition to that, to have your son make rental payments on a drug stash house is most certainly. Well, he lives there. You have to pay rent where you live. Well, unfortunately. I don't know about the reality is that, but you know, I guess I'm old. But when I, when I grew up, you know, kids paid bills for their, their parents. I mean, the minute time you go down there you got something on layaway, you go pay it. I guess now everything is electronic, but kids did that. I wouldn't engage in anything other than just paying rent. I mean, you're making societal cohabitation of people who are father and son into the elements of sufficient, but this is different. It's not a stranger. That's his son. I'm not making it. It's the guidelines. When you lead a minor, this particular minor, you have this unique dynamic between father and son into this particular conspiracy and you're having him pay rental payments on a stash house. This isn't getting coke on layaway. Okay. This is, is it a crime to live at a stash house? It isn't a crime to live in a stash house. However, there is an enhancement for a defendant who has his son pay rental. Let's take this by step. If there's no crime to live in a stash house, how is there a crime to have your child live in a stash house? We're not arguing that it's a crime to live in a stash house or a crime to have your, your child live there. What we're arguing is that there is an enhancement under the guidelines, which covers a defendant who would lead his child into a stash house and then have that child make rental payments. And if there's any question, whether this defendant has a superior role here is that this trailer that he's renting, in fact, has numerous blocks of blocks of cocaine hidden in the walls. And this confidential informant testified you're the man if you have blocks, but if you're the middleman, you have dust because it's cut defendants, the man. And so what we're learning from this, from this particular confidential informant, the officers told him we need to find out if this guy has a superior role. So figure out if he's got any hard blocks on him. And if you can figure that out, then we'll know if he's got a superior role in this conspiracy. And in fact, that's what we learned when they pull back the paneling and discover that there are multiple blocks hidden in the wall. We take leave of all jurisprudential sense when it comes to drugs. In other cases, we wouldn't dare say this is sufficient evidence. But when it's drugs, it's anything goes. You just confidential informant you talked about, no evidence that he went in there. So basically, he could have stopped at any house for two days, didn't get out. And then if later you find out that house had drugs in it, then that would be, he'd be in conspiracy for that stash house too, wouldn't he? Because he did stop there for an hour. Nobody saw him get out, but he stopped there. And later we find drugs there. That's the evidence at trial. Well, I think that Your Honor is actually commingling the evidence from trial and sentencing. Actually, it's sentencing. Because you started it because I was trying to get those silos because you said you're flipping back and forth. Now, let's put the switch down to the trial conviction. Wouldn't that be the same thing if he was a drug dealer, had four transactions? Okay. Two days of those four transactions, he stopped at a home, never got out, never saw him go in at all. But then later on, you find that that house was chock full of bricks of drugs. You say, oh, you're in a conspiracy because you had to have been in it. Isn't that the same theory you're using? No, Your Honor. Tell me how is it different from that hypo? What we're arguing is in the context of sentencing. No, see, then again, you're complaining. I'm talking about the conviction for conspiracy. So you're asking questions about the sufficiency of the evidence? Yes. Okay. That's a very important part because the rest of it doesn't matter. That would be moot if it's insufficient, all the sentencing stuff. That's the first issue today. We are absolutely arguing that in fact, if we have a defendant who is going back and forth to control purchases, and in the course of those four different deals, is able to access a significant amount of drugs. In the end, he says, look, I can get. How do you know he didn't already have what he needed in the trunk? That's what I'm saying. How do you presume that he has the truck in all four, correct? Yes, Your Honor. So what you do know that people do carry drugs in vehicles, right? Because we know that's all those stops on 95 that we get in the fourth circuit. There are people with tenant windows and don't know whether each one of them spent the night before they get stopped because the license plates obscure or they look tenant windows or whatever, or they go on five miles over the speed limit, all those stops. So we do know people carry drugs and cars, vehicles, right? Yes, Your Honor. So where's the evidence that he needed to go any place other than the truck to get the drugs that for four wasn't like he had so much drugs that you need some other supply. Where's the evidence that he would need another source, your physical location for source? I mean, what essentially answer that question. Counselor. Now I want you to go into this inferior jury argument. I want you to answer the facts of the question. We cannot ignore where the defendant was going in between these deals. We cannot ignore what was inside of that particular location where he was going. And we can't question the jury simply based on hypos. Like, well, what if he was sitting in the truck for overnight? What if he actually didn't go inside? And what if there was, it was just chock full of drugs inside that truck. And what if he didn't have anything to do with the house? He did go to the house. The house was chock full of drugs. And in fact, it was, and in between these deals, he was going on your evidence. He didn't go in. I do not agree with that. You may not agree with it, but that's the facts of the case. Well, I thought there were pictures of his bedroom. As we've argued, you know, already there were in fact pictures of his bedroom and it was identified as suppose cross-examination could have come out if they wished to say, how do you know it was his bedroom? And he would say, well, my son told me, or we found this or we found that. Or defense counsel certainly could have objected. Uh, but, but they did not. And so it came in that in fact, that was his bedroom where all of those drugs and where all of that paraphernalia was and all that cash, but you found nothing that belonged to him in the bedroom. No, the bedroom was identified as his, uh, in the truck. Uh, yes, your honor to, uh, J a two 84. Oh, you mean it looked at a picture and said that without any basis for that, that this wasn't just some man off the street. This was in fact, the agent who investigated. So in the, the agent was in certainly in the best position, uh, to say after our investigation, yes, this was the defendant's bedroom and they're inside because someone told him that we don't know. But what we do know is you're right. We don't even know where he got it from. What, what we do know above everything else is that government here, don't you have a responsibility to somehow present cases with some level of fairness? We have a responsibility on appeal to bring we do have a responsibility and we did meet that product question. It shouldn't have been asked. I don't want to speak out the rent receipt by the way. The question was simply that what were those exhibits of? It could have been pictures of a bedroom that the statement, uh, it's not a, the witness wasn't a legal expert. He made a response to the question and what should have happened.  what should have been done is defense counsel should have objected. They didn't. It's unfortunate for defendant, uh, because in that, and then asked on cross examination, what's his basis for it? Well, either way, I mean, there's, there's a, there's a unfathomable number of reasons why somebody can say this is his bedroom. Now he makes that bold statement. This is his bedroom. They have the receipt with his name on it. And, uh, uh, uh, we don't know this actually a trial that his son answers the door, but the, uh, he goes there in between transactions, parks his truck in there and, uh, is asked to be alerted when he comes back out and he's alerted. Now, the question is, is that enough evidence from a jury to conclude that that's his bedroom? Well, it's the only evidence. Absolutely. And in light of the standard of review that is viewed in the light most favorable to the United States, there was absolutely plenty of evidence that satisfied the standard. And unless there are any further questions, I'll take my seat. Thank you, Mr. Rogers. You said it shouldn't have been objected to that question. Shouldn't have been objected to your honor. Um, regardless of whether it should have been, it came in, it should have been, shouldn't it? Don't you agree? Defense counsel did object to it later success, but the first time it should have been objected to. It shouldn't. I don't, I don't really feel like I'm in the position to critique them in this, uh, with regard to whether or not it should have been objected to do that. You have to object to that because it would have to call for hearsay. Not necessarily. I mean, it hearsay. We don't even know if that was hearsay. If you objected, you'd have to lay a foundation to get it beyond hearsay. But the first defensive hearsay certainly would prevail until you've laid a foundation. Otherwise, I mean, again, I think we're wondering, would it not? It may have your honor, but what we're doing is wondering to conjecture that pulls us away from the standard of review here and, uh, and the fact that the United States did present sufficient evidence and it didn't have to be hearsay. Okay. Uh, we'll hear from Mr Gilbert. Thank you, your honor. It appears the government has conceded harmful error in this case because they've relied very strongly in argument upon, uh, inadmissible evidence. The government says there was no objection on page two 86, the next page after two age 85, the court sustained my objection to the agent referring to those as coming from my client's room. So I did object. The judge granted it. It was inadmissible. Objection appears to go to the picture of the nine millimeter carbine. No, it was the, uh, him calling it the room, your honor. I guess that depends all on how you read the transcript. Okay. And where, and where is the firearm located on the floor in the closet of Aaron Gomez's room? Objection, your honor. You're talking about junior when you talk about this, is that what you're talking about? No, sir. All right, I'll abstain the objection. Then the jury will disregard that. So your honor, I think it was clear at the trial that the trial court was not allowing them to put in that evidence. Also agent, uh, Chad Allen was the witness at that point and agent Allen testified in essence that he sat in the kitchen and collected items as people brought him in because he was responsible for the inventory of the collection of the evidence. And he, many times on cross-examination when asked about where things came from, said he, he didn't know basically he recorded where he was told where things came from. But I think that that, that, um, the judge did sustain our objections. We fought hard and long. Let me, let me go back to what you just, um, referred to this on page two 86. Yes, your honor. That's a reference to exhibit 90 right? I'm sorry. I might've pulled the wrong page. Well, no, it says 90, a picture of a high 0.9 millimeter carbine. Yes, sir. And that's what the objection is. But my, my cause, that's the gun evidence of the gun. Our objection was to the fact that he's claiming it came from Aaron Gomez's room, the closet. Fair enough. But that's exhibit 90. Yes, sir. How many other pictures were there? Seven or eight all admitted of, of which your honor of the room identified as Gomez's room. Aaron's room. But none, none of them distinctly linked it to it. There were two different places where the government, no, no. Right. And name it. Come and follow me on page two 84. The government introduced a series of photographs, right? Yes, your honor. And they were admitted and they were identified as Gomez's. I mean, Aaron's room. Yes, your honor. All right. Now later there's a, one of the pictures shows a carbine in, in the closet and you object to that. That's only, that's the scope of that discussion. It doesn't have anything to do with the other pictures. Well, right. We believe that our objection was timely. We tried to keep that enough. You made an objection to 90 and the judge sustained it. No, but the characterization of it being from his room, that's what we were objecting to. We earlier objected and the judge also sustained our objection when we, uh, when we objected to them, Gilbert, there is no way that this record can support us objection to the others. It's goes to exhibit 90 that's, and it's specific and it's showing it not. And the, the, the objection arises, uh, in connection with the demonstration of a, uh, gun in the picture. Isn't that right? That's correct. Um, I, I, I, if I could, I'd like to address, uh, uh, judge Agee's concern about Savion Matute. I know that that was addressed in the previous argument. I take a minute for that, but I would just like to say that, you know, here, here's the way I read all the case law on that. And the facts, there's no need for some talismanic incantation by a judge that they would have given the same sentence. However, um, uh, uh, uh, if a judge, if a judge gives a sentence that's above the guidelines and explains the variance and explains the, uh, reason it would have done that, then, uh, then Savion Matute is satisfied. The district court must give serious consideration to the extent of a departure or variance and must adequately explain the chosen sentence to allow meaningful appellate review. In this case, this case is much like the Montez Flores case that I think judge Agee brought up in the previous argument. Um, but pages 512 to 519 address the sentencing aspect where the judge said the alternative sentence. And the judge recited the 3553A factors. He highlighted the reasons why he thought the criminal history created a different, uh, United States sentencing guideline range from the co-defendants. The district court judge never addressed the topic at all. I'm sorry, Your Honor? The other case that was brought up, uh, Montez Flores and Raste's case, the district court judge in that case never addressed the variance sentence, an alternative at all. It's not, wasn't in the record anywhere. Yes, Judge Agee. And in my case, there wasn't a variance. My case was also a guideline sentence. What judge Dever did is he recited the factors. He, and then he specifically highlighted reasons why he thought the criminal history was significant. And he cited the need to protect the public. And then his desire to basically punish my client for the rest of his life for dealing drugs. But in comparison to the, to the case that the 28J letter was filed on and Raste's case, the two are completely factually different. Yes. I mean, you have no record in the other, in the other case, Montez Flores, you do have a record here. Well, um, I, you know, respectfully. You make, you can raise a legal question as to whether or not that's adequate, but I don't think the Montez Flores gives you any help at all. The bottom line I think is whether, uh, a new sentencing, uh, would be productive. It's a pragmatic question. And, and it seems to me, uh, the district judge in this case was basically saying, I'm trying to avoid the necessity of a new sentencing because under a new sentencing with those factors taken out, I would arrive at the same place. And, uh, uh, the question is whether we believe them. Yes, sir. And whether you can, if you, if you can elicit enough explanation. Yeah. Is essence what I wanted to say. Your Honor, could I just point one other thing about the conspiracy? You're pretty far behind the red light, you know, soon you get a ticket, but go ahead. Oh, I'm sorry. Um, basically with respect to conspiracy in the, in the Hackley case, which, uh, came out in 2011, this court said, you know, that was an outer limits case, finding a conspiracy, like a fellow, uh, referred to his family in Maryland. And they found that that was barely enough to tie him to it. In this case, we have a buy, sell transactions. Uh, we have no evidence of continuing relationships between my client and Pedro and Arasto. And, um, we just have repeated transactions between my client. Except that's not quite accurate because Peter, uh, Pedro and Arasto were living in the house cooking, uh, crack and, uh, uh, involving, uh, uh, the son of Aaron. And they're all in the same house. They all, uh, uh, operating from the same point of point. But if we go back to the trial phase, again, Your Honor, with the evidence there, the only evidence is repeated transactions by my client with the cooperating informant, who's a government agent. And, again, the vehicle being seen at the house. So, for those reasons, I ask the court to, uh, reverse the conspiracy conviction. All right, we'll come down in a Greek council and then proceed on to the last case.
judges: Paul V. Niemeyer, Roger L. Gregory, G. Steven Agee